# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

№ 1:26-CV-05431 (RER)

SIMON FLORES FLORES

VERSUS

RAUL MALDONADO, JR.; KENNETH GENALO; MARKWAYNE MULLIN; TODD BLANCHE; CURRENT DIRECTOR OR SENIOR OFFICIAL PERFORMING THE DUTIES OF DIRECTOR, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

**MEMORANDUM & ORDER**

**RAMÓN E. REYES, JR., District Judge:**

Petitioner Simon Flores Flores ("Petitioner" or "Flores Flores") has petitioned the Court for a writ of habeas corpus under 28 U.S.C. § 2241. (ECF No. 1 ("Pet."); *see also* ECF Nos. 7 ("Gov't Opp'n") and 8 ("Pet.'s Reply")). The Court held a show cause hearing on September 24, 2026. (ECF No. 11). Prior to the hearing, the government submitted a notice of supplemental authority, *Gagea v. Maldonado*, No. 26-CV-4817 (RPK), 2026 WL 2859032 (E.D.N.Y. Sept. 23, 2026), and Petitioner responded. (ECF Nos. 9 ("Gov't Notice"); 10 ("Pet.'s Resp."). After the hearing, Petitioner submitted a letter alerting the Court as to supplemental authority, *Almonte v. Genalo et al.*, No. 26-CV-3633 (GRB), 2026 WL 2983349 (E.D.N.Y. Oct. 5, 2026) (ECF No. 13 ("Pet.'s Letter")), to which the government has not responded.

For the reasons explained below, the Court GRANTS the petition.

## BACKGROUND

The following facts are drawn from the parties' filings and the September 24, 2026, hearing.

I. Factual Background

Flores Flores is a 56-year-old native and citizen of Mexico who arrived in the United States in 2000. (Pet. ¶ 1; Gov't Opp'n at 3). He was "encountered by U.S. Customs and Border patrol agents in San Diego, California, near the U.S. Mexico border," U.S. Citizenship and Immigration Services ("USCIS") found Flores Flores to have a credible fear of return to Mexico, and he was released. (Gov't Opp'n at 3). Petitioner has lived in the United States for approximately twenty-six years and "has consistently worked, paid taxes, supported his family, and maintained a stable residence in Queens." (Pet. ¶¶ 27, 29).

On July 5, 2016, Petitioner filed an affirmative relief application with USCIS. (Gov't Opp'n at 4). On November 2, 2020, Petitioner was served with a Notice to Appear ("NTA"). (*Id.*) On October 22, 2021, Petitioner appeared at a merits hearing in immigration court and the immigration judge granted his request, through counsel, for a continuance to file an I-130 Petition for Alien Relative. (*Id.*) On March 4, 2021, USCIS referred Petitioner's relief application to the immigration court. (*Id.*) On February 8, 2022, Petitioner's daughter filed an I-130 on his behalf, and it was approved on March 14, 2023. (*Id.*) Later, Petitioner filed an I-485 application to adjust status and that application was "subsequently administratively closed." (*Id.*) On October 24, 2024, Petitioner appeared, with counsel, at a master calendar hearing in immigration court where, pursuant to prosecutorial

discretion, DHS joined Petitioner's motion to dismiss the proceedings without prejudice, and the immigration judge granted the joint motion. (*Id.*)

## II. The August 14, 2026 Arrest

The parties' recitation of the facts surrounding Petitioner's arrest differ.

According to Petitioner, on August 14, 2026, while he was out for a morning jog he "was approached by a man wearing what appeared to be construction clothing." (Pet. ¶¶ 32–33). "The man displayed a photograph on a cellular telephone and asked whether Mr. Flores recognized the person shown." (*Id.* ¶ 33). "Mr. Flores responded that he did not." (*Id.*) "Mr. Flores did not know that the man was an immigration officer." (*Id.* ¶ 34). "The man was not, to Mr. Flores's perception, dressed in a standard law-enforcement uniform and did not initially identify himself in a manner that made his authority clear." (*Id.*) "Mr. Flores attempted to continue jogging because he had work and did not understand why a stranger was repeatedly questioning him." (*Id.* ¶ 35). "The man persisted, and additional men appeared and surrounded Mr. Flores." (*Id.*) "Mr. Flores states that approximately eight ICE agents ultimately surrounded him near the corner of 94th Street and 34th Avenue." (*Id.* ¶ 36). "The encounter lasted several minutes." (*Id.*) "He was then arrested and taken into immigration custody." (*Id.*) Later that day, "DHS initiated new removal proceedings against Mr. Flores by issuing a NTA." (*Id.* ¶ 36).

According to the government, on August 14, 2026, ICE officers "were conducting an enforcement operation in Queens, New York against an individual with a warrant of removal/deportation I-205 against him." (Gov't Opp'n at 4). "At around 11:45 a.m. officers observed Petitioner standing in the street in front of the target address." (*Id.*) "An SDDO approached Petitioner, identified himself as 'police' with badge clearly visible, for the

purpose of gaining information on ICE's intended target." (*Id.*) "The SDDO showed Petitioner a picture of the intended target on his cellular phone and asked Petitioner if he knew that individual, to which he responded that he did not." (*Id.*) "Additionally, during the SDDO's questioning, Petitioner provided his name and date of birth and stated that he was born in Mexico and did not have legal documents that allowed him to enter or remain in the U.S." (*Id.*) "The SDDO told Petitioner that he was being detained pending an investigation into his legal status." (*Id.*) "At that point, Petitioner attempted to flee on foot." (*Id.*) "ICE officers ran after Petitioner, caught up with him, and put him in handcuffs." (*Id.*) "Officers also conducted a check of federal databases that showed that Petitioner was a citizen and a national of Mexico and does not possess documents that would allow him to lawfully remain in the United States." (*Id.*) "ICE obtained a signed warrant of arrest from the SDDO on the scene." (*Id.*) ICE then transported Petitioner to 26 Federal Plaza for post-arrest processing, where he was issued and served an NTA, and ICE performed an initial custody determination (in which ICE determined that Petitioner should be detained because he had not established that he did not pose a flight risk). (*Id.* at 4–5). That same day, ICE filed the NTA with the Executive Office for Immigration Review ("EOIR") "thereby commencing removal proceedings against Petitioner." (*Id.* at 5). "The signed and served copy of the NTA was filed with EOIR at 2:41 p.m. on August 14, 2026." (*Id.*)

On the I-213 Form, the Deportation Officer wrote:

> The subject did not have identification but was able to verbally provide the following name and DOB: FLORES, Simon (redacted). Officers conducted an analysis of law enforcement databases in conjunction with a field interview and concluded the following: FLORES was born in Mexico, is a citizen of Mexico, illegally entered the US, and does not have legal documents allowing him to remain in the United States. Officers verbally told FLORES that he was being detained pending an investigation into his legal status in the United States. At that time, FLORES attempted to flee on

> foot. FLORES was detained a short distance away without incident. *Officers having developed a probable cause that FLORES is in violation of the INA obtained a signed I-200, Warrant for Arrest of Alien, from an SDDO on scene.*
>
> At approximately 1154 hours officers arrested FLORES pursuant to a signed I-200.

(ECF No. 7-3 at 3) (emphasis added).

Deportation Officer Kevin Brodowsky's Declaration states: "ICE obtained a signed warrant of arrest (I-200) from the SDDO on the scene" and "Petitioner is detained pursuant to 8 U.S.C. § 1226(a)." (ECF No. 7-2 ("Brodowsky Decl.") ¶¶ 17, 27).

## DISCUSSION

### I. Petitioner is Unlawfully Detained Under 8 U.S.C. § 1226(a)

Although the parties briefed issues concerning detention under both a warranted arrest pursuant to 8 U.S.C. § 1226(a) and a warrantless arrest pursuant to 8 U.S.C. § 1357(a)(2), the record demonstrates that Petitioner is detained under section 1226(a).

The lawfulness of custody is measured by the authority under which the government actually holds the detainee, not by an authority it might have invoked on findings it never made. *See Parada Cruz v. Mullin*, 837 F. Supp. 3d 404, 411 (E.D.N.Y. 2026) ("in none of these cases have Respondents proceeded on a warrantless basis. Having issued warrants—presumably because they believed they were required to—they cannot justify detention by relying on an alternative procedure they opted not to use, and wave away the warrants as unnecessary. The fact is warrants were used and relied on by the officers for the detention and the USAO in their papers opposing the habeas petitions. Bad facts cannot be ignored to create fictional and alternative realities.").

At the September 24, 2026, hearing, the government stated: "An NTA was not required for the warrantless arrest. Here, a warrant was issued at the scene. You could call that belt and suspenders." (Hearing Transcript ("Tr.") at 10:14–16). What the government characterizes as "belt and suspenders," is impermissible. A noncitizen cannot be detained under two different statutes simultaneously. The government must pick a lane and see the process of that lane through.

The I-200 Warrant for Arrest of Alien was executed, at the latest, at 11:54 A.M. on August 14, 2026. (ECF No. 7-3 at 3). "The signed and served copy of the NTA was filed with EOIR at 2:41 p.m. on August 14, 2026." (Gov't Opp'n at 5). This Court recently held that "the period during which section 1226(a) authorizes arrest and detention begins where the statute says it begins—upon *filing* of the NTA with the immigration court." *P.A.G.C. v. Genalo, et al.*, No. 26-CV-6545 (RER), 2026 WL 3216694, at *7 (E.D.N.Y. Oct. 27, 2026) (emphasis added). Since Respondents did not file Petitioner's NTA until *after* arresting Petitioner pursuant to a signed I-200, he is unlawfully detained under section 1226(a). *Id.*

II. <u>The Alleged Warrantless Arrest</u>

Although the parties briefed and argued claims surrounding Petitioner's alleged warrantless arrest under section 1357(a)(2), the record surrounding Petitioner's arrest reveals no mention of section 1357(a)(2) or a warrantless arrest. Respondents cannot create a post hoc rationalization for Petitioner's detention because of a "basic rule: . . . [a]n agency must defend its actions based on the reasons it gave when it acted . . . and may not rely upon reasons absent from its original decision." *Pastrana-Beltran v. Mullin*, No. 26-CV-2657 (RER), 2026 WL 1398609, at *2 (E.D.N.Y. May 19,

2026) (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 21, 24 (2020)).

Even if this Court were to analyze Petitioner's supposed warrantless arrest, Petitioner's detention would still be unlawful under section 1357(a)(2) for several reasons.

"Section 1357(a)(2), provides ICE with limited authority to conduct warrantless arrests." *Curimilma Quille v. Blanche*, No. 26-CV-2818 (HG), 2026 WL 1453889, at *5 (E.D.N.Y. May 22, 2026). "Specifically, ICE must obtain a warrant before arresting a noncitizen unless the officer 'has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation *and* is likely to escape before a warrant can be obtained for his arrest.'" *Id.* (quoting 8 U.S.C. § 1357(a)(2) (emphasis added)).

The phrase "reason to believe" has long been understood to mean probable cause. *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 3d 1, 49 (D.D.C. 2025) (collecting cases). Courts have interpreted the phrase "likely to escape" to mean "likely to disappear before officers can obtain a warrant or likely to evade detention altogether, not just whether the noncitizen would remain at the scene of the encounter, as Respondents contend." *Carlos F.P.P. v. Blanche*, No. 26-CV-3123 (JWB/JFD), 2026 WL 2824801, at *3 (D. Minn. Sept. 21, 2026) (collecting cases).[1] "Unlike individualized custody

[1] "Recent guidance from ICE is consistent with this definition: a January 2026 memorandum from former ICE Acting Director Todd Lyons interpreted the 'plain meaning' of the phrase 'likely to escape' in § 1357(a)(2) as likely 'to be located at the scene of the encounter or another clearly identifiable location once an administrative warrant is obtained.'" *V.P.R. v. Sheriff of Freeborn Cnty., et al.*, No. 26-CV-3047 (NEB/DLM), 2026 WL 2794171, at *3 (D. Minn. Aug. 7, 2026), *adopted by* 2026 WL 2546265 (D. Minn. Aug. 28, 2026).

determinations and bond hearings, which place the burden on the detainee to establish that they are not a flight risk, section 1357(a)(2) shifts the burden on the government to establish the risk of flight." *P.A.G.C*, 2026 WL 3216694, at *10.

Further, the statute requires "the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States." 8 U.S.C. § 1357(a)(2). Next, a non-citizen subject to a warrantless arrest "will be examined by an officer other than the arresting officer. If no other qualified officer is readily available and the taking of the alien before another officer would entail unnecessary delay, the arresting officer, if the conduct of such examination is a part of the duties assigned to him or her, may examine the alien." 8 C.F.R. § 287.3(a). Then, "[i]f the examining officer is satisfied that there is prima facie evidence that the arrested alien was entering, attempting to enter, or is present in the United States in violation of the immigration laws, the examining officer will refer the case to an immigration judge for further inquiry," 8 C.F.R. § 287.3(b), "within 48 hours of the arrest" to determine "whether a notice to appear and warrant of arrest . . . will be issued." 8 C.F.R. § 287.3(d). Respondents followed none of this process and, instead, once Petitioner was already in handcuffs, obtained a warrant and proceeded to execute his detention under section 1226(a). That does not comport with the process outlined in section 1357(a)(2) and the related regulations.

Separately, the record supports the contention that Petitioner was under arrest *before* he ran from the ICE officers, whether jogging or fleeing. In his letter citing supplemental authority, Petitioner argues, "Respondents rely upon Petitioner's alleged flight as satisfying the second requirement . . . [b]ut, by their own account, the alleged

flight occurred only after ICE had already informed Petitioner that he was being detained." (Pet.'s Letter at 2). The government's justification for warrantless detention "did not exist until after the detention had already begun." (*Id.*) In *Almonte*, Judge Brown rejected an ICE officer's testimony that an individual's lack of documentation, alone, is a sufficient basis for arrest. 2026 WL 2983349, at *8 n.6 ("At the hearing, Katepodis testified that awareness that an individual is undocumented, standing alone, provides a sufficient basis for an arrest by an immigration officer. Tr 126. Plainly, this is not the case."). This Court agrees.

Officer Brodowsky's declaration unequivocally states the following sequencing: (1) Petitioner gave the SDDO his name and date of birth, and stated he was born in Mexico and did not have legal documents; (2) *the SDDO told Petitioner he was being detained pending an investigation into his legal status*; (3) Petitioner attempted to flee on foot; (4) Petitioner was apprehended and placed in handcuffs; (5) officers checked federal databases, which showed that Petitioner was a citizen and national of Mexico and did not possess documents that would allow him to lawfully remain in the United States; (6) ICE obtained a signed I-200 from the SDDO on the scene; and (7) "Petitioner is detained pursuant to 8 U.S.C. § 1226(a)." (Brodowksy Decl. ¶¶ 14–17; 27) (emphasis added). The I-213 Form states the SDDO told Petitioner he was being detained pending an investigation into his legal status *solely* based on "an analysis of law enforcement databases in conjunction with a field interview" (ECF No. 7-3 at 3), stemming from Petitioner's own admission of his name, date of birth, and that he was born in Mexico and did not have legal documents allowing him to enter or remain in the country. This is slightly inconsistent with Officer Brodowsky's declaration, which states that officers did not check

databases until *after* Petitioner was in handcuffs. (Brodowksy Decl. ¶¶ 14–16). Accepting either version as true, and accepting that fleeing from officers at the scene is enough to establish that Petitioner was "likely to escape" under the statute, neither version is sufficient under section 1357(a)(2) because there is no indication that the second prong of the warrantless arrest statute was met *before* Petitioner was detained.

## CONCLUSION

For the reasons set forth above, the petition for writ of habeas corpus (ECF No. 1), is GRANTED. Respondents are directed to file a letter regarding their compliance with this order no later than **12:00 P.M. on October 30, 2026**.

Once the notice of release is received by the Court, the Clerk of Court is directed to enter final judgment and close the case.

SO ORDERED.

/s/ Ramón E. Reyes, Jr.

RAMÓN E. REYES, JR.
United States District Judge

Dated: October 29, 2026
Brooklyn, New York